UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.  ) | No. 25-cr-270 (SLS) |
| ) | |
| OMARI JUAN BEIDLEMAN, ) | |
| ) | |
| Defendant ) | |
| ) | |

### DEFENDANT'S MOTION TO DISMISS THE INFORMATION FOR FAILURE TO STATE AN OFFENSE

Omari Beidleman stands before the Court charged by information with assaulting, resisting, or impeding officers or employees of the United States under 18 U.S.C. § 111(a)(1). The officers the government alleges that Mr. Beidleman assaulted and resisted two members of the Mississippi National Guard, who were patrolling a Washington, D.C. Metro station for local crimes, while dressed in military fatigues and armed with rifles.

Pursuant to Federal Rule of Criminal Procedure 12(b)(2), Mr. Beidleman respectfully submits this motion to dismiss the Information because members of the Mississippi National Guard were not federal officers lawfully engaged in official duties when they were patrolling the D.C. Metro for local crimes. Nor were they assisting any specific officer in such lawful official duties. Therefore, as explained below, the government's allegations in this case are insufficient to establish a violation of § 111(a)(1). Accordingly, the defense respectfully moves the Court to dismiss the Information.

### BACKGROUND

On August 30, 2025, Mr. Beidleman was charged by criminal complaint with assaulting, resisting, or impeding certain federal officers and employees, in violation of 18 U.S.C. § 111(a).

1

ECF No. 1. The statement of offense attached to the complaint alleges that on August 29, 2025, at 12:00 p.m, members of the Mississippi National Guard were conducting law enforcement operations, *i.e,*, patrolling the Capitol South Metro Station. The two guardsmen identified as alleged victims in the complaint were Private First Class Quadarius Draine and Private First Class Javari Ewing. Both PFC Draine and PFC Ewing are members of the 112th Battalion, 114th Military Police Company.[1] The complaint alleges that while patrolling the Washington Metro, the guardsmen were notified of a physical altercation on a train.

Per the complaint, the guardsmen responded and separated two men engaged in the altercation, one of whom was Mr. Beidleman. At that point, Mr. Beidleman allegedly spat at PFC Draine, grabbed his body armor and firearm magazines, and reached for PFC Draine's firearm. PFC Ewing intervened, grabbing Mr. Beidleman by the hand. Mr. Beidleman allegedly resisted "resulting in an injury to PFC Ewing's left index knuckle." ECF No. 1-1. The guardsmen placed Mr. Beidleman in handcuffs, threw him to the ground, and PFC Draine stood with his boot on Mr. Beidleman's chest. At this point, Mr. Beidleman allegedly spat at PFC Draine's boot.

The government filed an information against Mr. Beidleman on September 8, 2025, alleging that he "unlawfully, knowingly, and intentionally forcibly assault, resist, oppose, impede, intimidate, and interfere with" PFC Draine and PFC Ewing, "persons designated in Section 1114 of Title 18, United States Code, while engaged in or on account of the performance of that person's official duties," in violation of 18 U.S.C. § 111(a)(1). The government has charged this offense as a misdemeanor under § 111(a).

---

[1] The National Guard Military Police are typically tasked with "protect[ing] the lives and property *on Army National Guard installations* by enforcing military laws and regulations." *Military Police*, Army National Guard – 31B-Military-Police, https://nationalguard.com/31b-military-police.

In general, § 111(a)(1) proscribes forcibly "assault[ing], resist[ing], oppos[ing], imped[ing], intimidate[ing], or interfere[ing] with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties." 18 U.S.C. § 111(a)(1). When such "acts constitute only simple assault" the crime is a misdemeanor, punishable by "not more than one year" imprisonment. *Id.* "[W]here such acts involve physical contact with the victim of the that assault or the intent to commit another felony," the offense is transformed into a felony punishable by "not more than 8 years" imprisonment. *Id.*

A "person designated in section 1114" of Title 18 includes "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance." 18 U.S.C. § 1114; *see also United States v. Arrington*, 309 F.3d 40, 43 n.2 (D.C. Cir. 2002).

## ARGUMENT

The Information filed against Mr. Beidleman must be dismissed because, even when accepted as true, the allegations do not amount to a violation of 18 U.S.C. § 111(a). A § 111(a) violation requires that a defendant assault a "federal officer or employee" while that person is engaged in "official duties." Neither of those elements is met here. First, PFC Draine and PFC Ewing are not federal officers or employees because members of the Mississippi National Guard are state employees, not federal, and at the time of this incident, the PFCs were not actively assisting a officer or employee. Second, PFC Draine and PFC Ewing were not engaged in any official duties when Mr. Beidleman allegedly assaulted them because the PFCs were acting

3

without authority in violation of the Interstate Emergency Assistance Compact and the Posse Comitatus Act.

I.  **Motions to Dismiss**

The Court has the authority to grant a motion to dismiss where the evidence is undisputed and the determination regarding the sufficiency of the evidence is a legal question. *See United States v. Nitschke*, 843 F. Supp. 2d 4, 8-9 (D.D.C. 2011). The Federal Rules of Criminal Procedure require that an information must consist of "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "When considering a motion to dismiss [a charging document], a court assumes the truth of those factual allegations." *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952)). If, after assuming the truth of the factual allegations in the information, the elements of the offense have not been met, the Court must dismiss the information.

II. **PFC Draine and PFC Ewing are not covered by § 1114**

Members of the Mississippi National Guard are not federal officers or employees. They are employees of the State of Mississippi. Mr. Beidelman, therefore, cannot be convicted of committing an offense under § 111(a) for allegedly assaulting members of the Mississippi National Guard.

**A. PFC Draine and PFC Ewing are not "officers or employees of the United States"**

    **1. The National Guard[2]**

At the nation's founding, the Framers divided control over state militias in order to protect "individual liberty" and "the sovereignty of the separate States." *Perpich v. Dep't of Defense*, 496 U.S. 334, 340 (1990). The Founding generation "strongly disfavored standing armies" and believed that "adequate defense of country and laws could be secured through the Militia"—a force composed of "civilians primarily, soldiers on occasion." *United States v. Miller*, 307 U.S. 174, 179 (1939). At the same time, the experience of the Revolutionary War and the Articles of Confederation taught the Founding generation that "[t]he steady operations of war" required "a regular and disciplined army" under centralized federal command. The Federalist No. 25 (Alexander Hamilton).

The Constitution therefore reflects a compromise. It "reserv[es] to the States" the principal power over the "Militia," including the authority to appoint its officers, train its members, and "govern[] such Part of them" as are not in federal service. U.S. Const. art. I, § 8, cl. 16. At the same time, the Constitution vests Congress with authority "[t]o raise and support Armies" for terms of no longer than "two years." *Id.* art. I, § 8 cl. 12. It also grants Congress the powers necessary to ensure that the Militia is a professional force available for national emergencies: it states that Congress may provide for "organizing, arming, and disciplining, the Militia," *id.* art. I, § 8, cl. 16, and for "calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions," *id.* art. I, § 8, cl. 15.

---

[2] The defense relies heavily on the Complaint filed by the Plaintiff in *D.C. v. Donald J. Trump*, 1:25-CV-3005-JMC, in this section.

The National Guard is the modern Militia. It is governed by a statutory framework that embodies the careful balance struck in the Constitution. In general, National Guard units are under the command of the states. A state National Guard unit may be activated by its governor to perform state law duties under state command and control, funded by the state, and with pay and benefits determined by state law. This is known as "state active duty status."[3] National guard units can be in state active duty status in states other than their home states, such as when the South Carolina National Guard travels to North Carolina to help with a weather disaster.

National Guard units are also subject to general rules of organization, training, and discipline set forth in Title 32 of the U.S. Code. At the request of the President or Secretary of Defense, a state National Guard unit may be activated by its state governor to perform training or duty under state command and control, funded by the federal government, with pay and benefits determined by federal law. This is known as "Title 32 status." *See* 32 U.S.C. § 502(f).

In rare circumstances, set forth in Title 10 of the U.S. Code, the President may activate the National Guard, thereby making it part of the federal military subject to his direct control. This is known as "Title 10 status." But these circumstances are limited to the most severe exigencies. They include cases in which a state "request[s]" federal aid to suppress an "insurrection . . . against its government," 10 U.S.C. § 251, or when the United States "is invaded or is in danger of invasion by a foreign nation," *id*. § 12406(1).[4] Notably, these rare circumstances do not include federalizing the national guard for purposes of local law enforcement.

---

[3] *See generally*, National Guard Bureau Fact Sheet, National Guard Duty Statuses, https://www.nationalguard.mil/Portals/31/Resources/Fact%20Sheets/NGB-Fact-Sheet-Duty-Status-Reference-FINAL.pdf.

[4] The District of Columbia National Guard (DCNG) is unique because, regardless of duty status, the President of the United States is always its Commander-in-Chief. D.C. Code § 49-409. What the President may do with the D.C. National Guard is governed by the D.C. Code. For instance,

Members of the National Guard are, therefore by default, on state status, paid by their state and commanded by their state governor, unless legally called to federal service. 10 U.S.C. § 12401 ("Members of the Army National Guard of the United States and the Air National Guard of the United States are not in active Federal service except when ordered thereto under law.").

### 2. The Mississippi National Guard have not been federalized

Members of the Mississippi National Guard in the District of Columbia have not been federalized under any provision of law and are, therefore, operating in D.C. as state actors.

On August 11, 2025, President Trump directed the Secretary of Defense "to mobilize the District of Columbia National Guard and order members to active service, in such numbers as he deems necessary, to address the epidemic of crime in our Nation's capital." Memorandum re: Restoring Law and Order in the District of Columbia (Aug. 11, 2025), [Restoring Law and Order in the District of Columbia – The White House](#). President Trump asserted that this was necessary to combat "menacing street crime" because the "local government of the District of Columbia has lost control of public order and safety in the city." *Id.* In addition to mobilizing the D.C. National Guard, President Trump directed "the Secretary of Defense to coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission." *Id.*

On August 18, 2025, Governor Tate Reeves ordered that 200 members of the Mississippi National Guard would be deployed to Washington, D.C., "to support President Trump's effort to return law and order to our nation's capital. Crime is out of control there, and it's clear something

---

the President may activate the DCNG to "aid the civil authorities in the execution of the laws," D.C. Code § 49-404, only when there is a "tumult, riot, mob," or similar disturbance, and the Mayor, the U.S. Marshal for the District, or the National Capital Service Director requests aid. *Id.* § 49-103. The unique status of the DCNG is irrelevant to this case where the alleged victims in this case are members of the Mississippi National Guard.

7

must be done to combat it. Americans deserve a safe capital city that we can all be proud of. I know the brave men and women of our National Guard will do an excellent job enhancing public safety and supporting law enforcement." *Governor Reeves Statement on Mississippi National Guard Deployment to Washington, D.C.* (Aug. 18, 2025), https://governorreeves.ms.gov/governor-reeves-statement-on-mississippi-national-guard-deployment-to-washington-d-c/.

The Mississippi National Guard is operating in D.C. under the orders of the Governor of Mississippi. They are, therefore, operating under State Active Status, like when members of the national guard are sent to assist with a national disaster relief in another state. No provision of law has been invoked to allege that the Mississippi National Guard are acting on Federal Active Duty status under Title 10. And similarly, no provision has been invoked to show that they are acting under the hybrid Title 32 status. Even if the Mississippi National Guard were operating in D.C. under Title 32 Status, "Guard members in Title 32 status fall under the command and control of their state or territory governor." *National Guard Duty Statuses*, supra. PFC Draine and PFC Ewing were employees and officers of the state of Mississippi when they encountered Mr. Beidleman. Mr. Beidleman, therefore, cannot have committed a violation of § 111(a)(1), and the Information must be dismissed.

### B. PFC Draine and PFC Ewing were not assisting any officer or employee of the United States.

In addition to officers and employees of the United States, 18 U.S.C. § 111(a) and § 1114 protect "any person assisting such an officer or employee in the performance of such duties." § 1114(a).

Here, PFC Draine and PFC Ewing were not assisting any federal officer or employee. PFC Draine and PFC Ewing were operating with other Mississippi National Guard Military Police at the Capitol South Metro Station conducting law enforcement operations. There were no federal

8

law enforcement officers or any other federal employees with them. There were not even any WMATA law enforcement officers were them. The information must therefore be dismissed.

### C. PFC Draine and PFC Ewing were not conducting any official duty because their actions were unlawful.

The complaint in this case could not be clearer: two members of Mississippi's state Militia were conducting routine patrol for purely local crimes in an American city's metro station. This in and of itself is an affront to a fundamental tenet of American democracy—that military forces should not be involved in domestic law enforcement. Even if the Court determines that PFC Draine and PFC Ewing are federal officers or employees, they were not engaged in "official duties" when arresting Mr. Beidleman.

For purposes of § 111(a), to be conducting official duties, PFC Draine and PFC Ewing must have been conducting *lawful* activities. Here, PFC Draine and PFC Ewing were engaged in local law enforcement activity in violation of the Emergency Management Assistance Compact and the Posse Comitatus Act (PCA). Because they were operating outside of the law, PFC Draine and PFC Ewing were no longer conducting official duties, and the information must be dismissed.

### 1. The Mississippi National Guard is conducting local law enforcement in D.C. in violation of the Emergency Assistance Compact.

All 50 states, four U.S. territories, and the District of Columbia have entered into an interstate compact, known as the Emergency Management Assistance Compact (Assistance Compact), that governs the deployment of non-federalized National Guard units between jurisdictions. *See* H.J. Res. 193, 104th Cong. (1996).

The Assistance Compact provides that "states"—defined to include the District of Columbia—may deploy emergency assistance to another state upon "request" of that state. *Id.* arts. I, III.B. Once sent into another state, "emergency forces" are under "the operational control . . . of the state receiving assistance" and "shall be considered agents of the requesting state." *Id.*

9

arts. IV, VI. The Assistance Compact specifies that "[m]utual assistance in this compact may include the use of states' National Guard forces, either in accordance with" an interstate compact "or by mutual agreement between states." *Id.* art. I.

Congress and the President assented to the Assistance Compact in 1996, making it federal law. Emergency Management Assistance Compact, Pub. L. No. 104-321, 110 Stat. 3877 (1996); *see Cuyler v. Adams*, 449 U.S. 433, 438 (1981). The Council of the District of Columbia subsequently authorized the Mayor to "execute" the Compact. D.C. Code § 7-2332. Accordingly, since 2002, the Mayor has been responsible for determining when to "request" the deployment of other states' National Guard forces into the District. *Id.* art. III.B.

The Mayor of the District of Columbia did not request additional national guardsmen from the other member states of the Assistance Compact. The Mississippi National Guard is, therefore, occupying D.C. in violation of the Compact. Because they are in D.C. unlawfully, the Mississippi National Guard, including PFC Draine and PFC Ewing cannot be said to be engaged in any official duties.

    **2. The Mississippi National Guard is conducting local law enforcement in D.C. in violation of the Posse Comitatus Act.**

The Posse Comitatus Act prohibits the National Guard from engaging in local law enforcement. Because PFC Draine and PFC Ewing were engaged in unlawful local law enforcement in violation of the U.S. Code, they were not engaged in an "official duty" under § 111(a) when they arrested Mr. Beidleman.

During the nineteenth century, United States Marshals increasingly used the common law power of "posse comitatus"—a Latin phrase that translates roughly to "the power of the county" or "the power of the sheriff"—to deputize citizens, including members of militias and the military, to aid in the enforcement of federal laws. In 1878, Congress rejected this practice and enacted the

10

Posse Comitatus Act (PCA), 18 U.S.C. § 1385, codifying a fundamental principle of American democracy: military forces are, as a general matter, strictly prohibited from engaging in domestic law enforcement. The PCA has recently been described at length by Senior Judge Breyer of the U.S. District Court for the Northern District of California. *Newsom v. Trump*, --- F. Supp. 3d ---, 2025 WL 2501619, *10 (N.D. Cal. Sept. 2, 2025).

The PCA provides that no person may "willfully use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except where "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. When National Guard units are brought into federal service, the PCA applies to them, absent an express statutory exception.

Congress has also enacted a statute that extends similar limits to military establishments not initially covered by the PCA. Title 10 U.S.C. § 275, requires the Secretary of Defense to "prescribe such regulations as may be necessary to ensure that any activity . . . under this chapter does not include or permit direct participation by any member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless otherwise authorized by law." The Secretary has implemented this requirement by issuing a policy directive that generally bars nearly all "DoD personnel" from providing "direct civilian law enforcement assistance," including but not limited to "a search or seizure," an "arrest" or "apprehension," and "security functions" or "crowd and traffic control." Dep't of Defense Instruction No. 3025.21, at 18–19 (updated Feb. 8, 2019).

"Under the Posse Comitatus Act, the military may not engage in activities that 'constitute the exercise of regulatory, proscriptive, or compulsory military power,' that 'amount to direct active involvement in the execution of the laws,' or that 'pervade the activities of civilian

11

authorities.'" *Newsom*, 2025 WL 2501619, at *18 (quoting *United States v. Dreyer*, 804 F.3d 1266, 1275 (9th Cir. 2015) (en banc). "Though framed as three separate inquiries, the test is at its core the same: whether the military has executed domestic law or actively assisted with the execution of domestic law, which would violate the Act, or whether the military's involvement is so indirect as to not violate the Act." *Id.*

Earlier cases are instructive as to when the PCA is violated. In *Dreyer*, the results of a Naval Criminal Investigative Service agent's investigation into child pornography crimes became the basis of a search warrant executed by state authorities. The Ninth Circuit concluded that the investigation NCIS had "pervaded the actions of civilian law enforcement" in violation of the PCA-like restrictions. 804 F.3d at 1275–76 (because "the PCA does not directly reference the Navy or Marine Corps," courts have held that it is § 275 that "prohibits Navy involvement in enforcing civilian laws" (quotation marks omitted)). In *United States v. Yunis*, however, the D.C. Circuit decided that the Navy had not violated the PCA-like restrictions in § 275 by housing and transporting a criminal defendant. The Circuit concluded that the actions at issue were too "passive" to constitute a violation. 924 F.2d 1086, 1094 (D.C. Cir. 1991). *See also Newsom*, 2025 WL 2501619, *18 (collecting cases).

In *Newsom*, the district court concluded that the National Guard had violated the PCA by engaging in "certain law enforcement activities: setting up protective perimeters, traffic blockades, crowd control, and the like." *Newsom*, 2025 WL 2501619, *24. "Indeed, Task Force 51 troops' conduct clearly qualifies as Posse Comitatus Act violations under the tests that courts use to apply the Act. [The National Guard's] presence to bolster DHS and DEA operations and shows of force exercises regulatory, proscriptive, and compulsory power on the surrounding public, and their

participation in operations in numbers that match or outnumber law enforcement agents pervade the activities of those civilian agents." *Id.*

In addition, the *Newsom* court concluded that the National Guard was violating the PCA because the National Guard's conduct was not "passive and isolated in nature." *Newsom*, 2025 WL 2501619, *25. "Where military conduct is more coordinated and systemic, . . . courts have found Posse Comitatus violations. *E.g.*, *Dreyer*, 804 F.3d at 1275–76 (NCIS investigation was "systemic" and thus violated Posse Comitatus Act); *see also Bissonette*, 776 F.2d at 1385 (ten-week-long occupation at Wounded Knee violated the Posse Comitatus Act)." *Id.*

Here, the Mississippi National Guard—including PFC Draine and PFC Ewing—was in D.C. conducting local law enforcement activities in violation of the PCA. The Information and complaint show that the two guardsmen were patrolling for law enforcement purposes at the Capitol South Metro Station, and they were engaged in local law enforcement activities when they responded to an alleged altercation. The guardsmen's arrest of Mr. Beidleman at the Capitol South Metro is a blatant violation of the PCA and as a matter of law cannot be deemed an official duty. There can therefore be no violation of § 111 with regard to these guardsmen and the Information must be dismissed.

### III. The D.C. Home Rule Act does not authorize deploying the National Guard to occupy the District of Columbia

The District of Columbia Home Rule Act ("D.C. Home Rule Act") (codified as amended at D.C. Code §§ 1-201.01, *et seq.*) was enacted by Congress over 50 years ago to "grant to the inhabitants of the District of Columbia powers of local self-government" and "delegate certain legislative powers to the government of the District of Columbia." D.C. Code Ann. § 1-201.02 (West, Westlaw through July 21, 2025). Congress enacted this legislation pursuant to its constitutional authority "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the]

District." U.S. Const. art. I, § 8, cl. 17. The Home Rule Act permits "registered qualified electors of the District" to elect members of a City Council, § 1-204.01(a) (West), in which the "legislative power granted to the District . . . is vested in," *id.*, and a mayor, § 1-204.21(a) (West), in which the "executive power of the District" is vested in and who "shall be the chief executive officer of the District government," § 1-204.22 (West). Congress reserved for itself, however, the authority "at any time, to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject, whether within or without the scope of legislative power granted to the Council." § 1-206.01 (West).

By contrast, Congress designated to the President only a narrow role in the District's governance. *See* § 1-207.40 (West). In Section 740 of the Home Rule Act, titled "Emergency control of police," Congress provided that, "whenever the President . . . determines that special conditions of an emergency nature exist," he may "direct the Mayor to provide him" with the "services of the Metropolitan Police force as the President may deem necessary" for "federal purposes." § 1-207.40(a). The President's authority to act under Section 740, however, is subject to sharp time limits. § 1-207.40(a)-(c). First, any such action must terminate within 48 hours unless the President has notified Congress of "the reason for such direction and the period of time during which the need for such services is likely to continue." § 1-207.40(a). Second, if the President invokes this authority while Congress is adjourned, such services "shall terminate upon the end of the emergency, the expiration of the 30-day period following the date on which Congress first convenes," or by "the enactment into law of a joint resolution by Congress providing for such termination, whichever first occurs." § 1-207.40(a), (c). If Congress is in session while the President takes such action, the 30-day clock starts "following the date on which such services are first made available." § 1-207.40(b).

The Home Rule Act does not permit the President to deploy members of the National Guard into the District of Columbia. Indeed, the Congress which passed the Home Rule Act was clearly circumspect of the National Guard being deployed in the District for law enforcement purposes. During discussions of the President's authority over the MPD Senator Cotton (R-NH), a Republican from New Hampshire, vehemently disapproved of the D.C. National Guard engaging in local policing:

> If there is one thing that this Senator and I think all Members of Congress have viewed with regret and with sorrow during the past few years, particularly during the demonstrations we had over Vietnam and other kinds of unrest, it has been to have Federal troops or the National Guard called out and to appear on the streets, or to surround the Capitol or any other department of government in this district. *It does not improve the prestige of this nation with other nations to have Federal troops or National Guardsmen patrolling and protecting the Government of the United States*. I feel it is highly essential that insofar as it is possible all law enforcement within the city of Washington should be in the hands of the police of Washington and *that only under the most drastic and desperate circumstances, as a matter of national pride and national self-respect, should we ever have to see the streets of this city patrolled by Federal troops*.

Legislative History of District of Columbia Self-Government and Governmental Reorganization Act, Comm. on the District of Columbia, 93rd Cong. Part A, at 1195 (May 8, 1974) at 378-79.

The government, therefore, cannot rely on the Home Rule Act to justify the deployment of out-of-state National Guard into the District of Columbia for law enforcement purposes.

## **CONCLUSION**

For the foregoing reasons, and for any other such reasons that may be presented at a hearing on this motion, Mr. Beidleman respectfully requests that this Court dismiss the Information in this case with prejudice.

Respectfully submitted,

                                      A. J. KRAMER
                                      FEDERAL PUBLIC DEFENDER

                                                  /s/
                                      _____

                                      ELIZABETH MULLIN
                                      MATTHEW FARLEY
                                      Assistant Federal Public Defenders
                                      625 Indiana Avenue, N.W., Suite 550
                                      Washington, D.C.  20004
                                      (202) 208-7500